UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK (BROOKLYN)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MAXIM LARIN,<br>Defendant. | Case No. 1:25-cr-00246-NRM-1<br><br>Brooklyn, New York<br>November 5, 2025<br>12:00 p.m. |

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE JOSEPH A. MARUTOLLO
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Gilbert Rein, Esq.<br>U.S. Attorney's Office<br>271-A Cadman Plaza East<br>Brooklyn, NY 11201 |
| For the Defendant: | Jullian D. Harris-Calvin, Esq.<br>Federal Defenders of New York<br>One Pierrepont Plaza<br>16th Floor<br>Brooklyn, NY 11201 |
| Clerk: | MAA |
| Court Recorder: | Electronic Sound Recording |
| Transcription Service: | Chris Hwang<br>Abba Reporting<br>PO Box 223282<br>Chantilly, Virginia 20153<br>(518) 302-6772 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**INDEX**

| | Page |
|---|---|
| Court's Ruling | 36 |

(Call to order at 12:00 p.m.)

THE CLERK: Okay, this is a criminal cause for a bail application, USA v. Maxim Larin, case number 25-CR-246.

Counsel, your name for the record for the Government?

MR. REIN: Good afternoon, Your Honor. Gilbert Rein, the United States.

THE COURT: Thank you, Mr. Rein.

And appearing from Mr. Larin?

MS. HARRIS-CALVIN: Good after -- I think it's the morning, Your Honor.

THE CLERK: It's just 12 o'clock, my thing just turned.

MS. HARRIS-CALVIN: Just trolling the Government.

THE CLERK: Yeah.

MS. HARRIS-CALVIN: Jullian Harris-Calvin on behalf of Maxim Larin, who's present and I'm of the Federal Defenders.

THE CLERK: Thank you very much.

THE COURT: Okay.

THE CLERK: Okay, Judge.

THE COURT: All right, good morning, everyone. So we're here for a detention hearing. The Government is seeking a permanent order of detention stemming from a letter that they filed on August 21st, 2025, right, at docket entry number 6 in this case?

MR. REIN: That's correct, Judge.

THE COURT: And then, the Defendant has put together a bail package and then also filed a letter at docket entry 16 that was file at November 3rd. And I've reviewed both letters.

Before I take argument from the parties, the -- and Mr. Larin, I just want to talk a little bit further about the general principles that the Court looks at in this type of a hearing.

First, at all times, the Defendant, in this case you Mr. Larin, is entitled to the presumption of innocence. Nothing that takes place in this hearing, whether I set forth in any findings, is intended or should be construed to affect that presumption.

Rather, the purpose of this hearing is to determine whether notwithstanding that presumption of innocence, the Defendant should be detained pending trial.

Second, the Bail Reform Act prescribes the statutory standards for determining whether a criminal Defendant should be detained or released pending trial.

Pursuant to the Act, the Court shall order the pre-trial release of a defendant on personal recognizance or upon execution of an unsecured appearance bond and are not specified by the Court unless the judicial officer determines that such release will not reasonably assure any appearance of the person as required or endanger the safety of any other person or the community.

To support pre-trial detention, the Government must establish by a preponderance of evidence that the Defendant presents a serious risk of flight or obstruction of justice.

And again, if the Government carries its initial burden, then the Court must determine whether there are reasonable conditions of release that can be set to ensure the Defendant's appearance and the safety of any other person or the community.

And I just note there, I've been citing to United States v. Baig, 536 F.App'x. 91 from the 2nd Circuit in 2013 as well as *United States v. Kwok*, K-W-O-K, 2024 W.L. 54170 from the Southern District of New York in 2024.

In making this determination, the Court must consider the following factors as set forth in 18 USC 3142(g). All right, that's the nature and circumstances of the offense charged, including whether the offense is a crime of violence.

Second, the weight of the evidence against the person.

Third, the history and the characteristics of the person, including his character, physical and mental conditions, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history related to drug or alcohol abuse, criminal history, and the record concerning appearance in court proceedings, and the nature and seriousness of the danger to

any person or the community imposed by the person's release.

And there, I'm citing to *United States v. Atomei*, A-T-O-M-E-I, 2024 W.L. 1934195 from the Eastern District of New York in 2024.

The weight of each factor will inevitably vary from case to case. It might even vary depending on whether the inquiry relates to Defendant's danger or to his risk of flight. And that's a statement from the United States v. Zhang, 55 F.4th 141 from the 2nd Circuit 2022.

The Act requires that the least restrictive conditions be imposed that are necessary to provide those reasonable assurances that I described.

If I cannot find that any conditions will reasonably assure the appearance of the Defendant as required or the safety of the person in the community, then I'm required by the act to order the Defendant to be held in custody.

All right, so let me ask, what is the Government proceeding on here? Is it flight, danger, or both, or something else?

MR. REIN: Judge, we're proceeding on primarily flight.

THE COURT: Okay.

MR. REIN: I can outline for Your Honor --

THE COURT: If you could. And I'll ask the Defense to respond although I'm going to have questions in the middle

as well.

MR. REIN: Absolutely, Judge. And I'll just note we initially appeared before Judge Merkl on September 29th, 2025. And the Government made the same argument in favor of detention at that point. And I understand Defense counsel reserved a bail application, is now making one today.

But the Government's request for detention is based primarily on three different factors. The first being that the facts in this case, the second being the weight of the evidence, and the third being the Defendant's foreign ties.

In this case, and I will note the Government filed a rather lengthy speaking indictment, which outlines the allegations in this case on the Government's evidence of the Defendant's involvement in the crimes.

But in this case, the Defendant was involved in export control evasion scheme. He is the owner of a firearms parts company. And he agreed to devalue and mislabel firearms parts before shipping them overseas, particularly to Kazakhstan in violation of the Export Control Reform Act.

These different parts, which were things that made firearms fire in a more effective way, make them more efficient to use were shipped by the Defendant to Kazakhstan, which is on the border of Russia. And this is in violation of ECRA. Kazakhstan is a known transshipment point for weapons, which are ultimately destined to -- for Russia and Russia's war

effort.

In addition to --

THE COURT: Could you expand little bit further because I mean you indicate that the charges are extremely serious and threaten the national security --

MR. REIN: Yes.

THE COURT: -- of the United States and its allies. And the Defense raises arguments in their letter about kind of painting with a broad brush here about Kazakhstan. So can you go into a little more detail about why in the Government's view that's significant that these were being sent to Kazakhstan?

MR. REIN: Certainly. So, first, these items are specifically controlled to Kazakhstan. They're not controlled to just any country, particularly Kazakhstan because the Department of Commerce, the Bureau of Industry and Security, has determined that Kazakhstan is a known transshipment point for certain types of weapons.

In particular, the items were sent to places which border Russia within Kazakhstan, so not just any location in Kazakhstan, particularly cities which are in close geographic proximity to Kazakhstan.

In addition to just ordinary firearms parts, the Defendant also procured on behalf of the co-defendant, who remains unapprehended, a device called a RAPTAR device, which is a precision targeting device, which is used by people who

are using a firearm to more accurately fire the firearm.

And he did so knowing that these -- that this item would ultimately be shipped out of the country. It's subject to the ITAR, the International Trade and Arms Regulations. And it -- and the ITAR prohibits the shipment of anything that is subject to it outside of the country no matter where it's going.

And the Defendant, in procuring this item, was sent an invoice and paperwork from a company he got it from, which specifically said that the item was subject to ITAR, but the item was still shipped according to the co-defendant's instructions and it was known based upon the --

THE COURT: Where was that sent, though? To Oregon? In page 6 to the detention memo, there's language that indicates the Defendant shipped the RAPTAR device to a co-conspirator in Oregon. The co-conspirator then re-packaged the device --

MR. REIN: Yes.

THE COURT: -- shipped it to another co-conspirator in Kazakhstan.

So -- and there seems to have some acknowledgement that he could not send it to Kazakhstan directly. What's the Government's view on that point?

MR. REIN: So the Defendant specifically was aware of the risk of sending things outside of the country. And so,

asked the co-defendant to provide an address in the United States.

But the evidence in the case showed that the Defendant knew that ultimately the item would be shipped outside the United States. It was just an attempt to cover his tracks, so to speak, to cover his actions to evade U.S. export controls.

In various other instances where the Defendant shipped things that were export controlled, he readily agreed with the co-defendant to mislabel the things.

And for example, the firearms parts that he agreed to label as clothing or something innocuous like a light switch so that it would be shipped, it could be shipped outside the United States, in the indictment in reference to the fact that the Defendant told the co-defendant that some of the items he was going to be shipping had pictures of soldiers on the boxes. And he asked if he should repackage the things to avoid detection from U.S. authorities. So then, certain was aware of the implications of the actions he was taking.

And this actually also speaks to the weight of the evidence in this case. And this case is based primarily on communications, which are obtained via search warrant.

And so, really, it's really the Defendant's own words which were captured by the Government and invoices produced by his company that he shipped to the -- that he sent to the

co-defendant, which really document the crime.

The Defendant knew these items were being shipped to Kazakhstan. The invoices his company produced showed what the true nature of the items were, but yet, in Customs records, which correspond to the shipping invoice numbers that the Defendant's company produced, the items are labeled as something innocuous like clothing or a light switch.

And also at the time of Defendant's arrest, the Government seized multiple electronic devices and -- including computers and cell phones from his residence. And so, it's the Government's position that this case will only be getting stronger.

In this case, it's important to note that the Government did seize these devices because the Defendant's foreign ties included the fact that he had registered his -- the Internet website for his business and his email accounts outside of the United States, including in Russia. Information that the Government has obtained shows that the domain's actually hosted in Russia.

And so clearly, the Defendant has these ties, which the Government views as significant to a not extradiction country, Russia. The Defendant possessed --

THE COURT: So just so I understand that last point because I don't think that was in the letter from August, so in terms of foreign ties, is the Government arguing that that's a

foreign tie, that he's registered his web domain for his company in Russia?

MR. REIN: He's registered his web domain and he also is affiliated with another company, which is based in Russia. The Defendant has a company called Four Shooters, which is also known as Four Range. There's another company in Russia called I-shooters, which is associated with the Defendant.

The Defendant also is a Russian citizen and possessed a Russian passport, which was seized at the time of his arrest in this case.

He also has a demonstrated affinity for Russia. In reviewing some of the Defendant's devices preliminarily, the Government came across communications between the Defendant and others in which he expressed support for Russia's military effort in Ukraine and wrote specifically, and this was in the Government's letter that he wished Kyiv, which is the capital of Ukraine, had fallen in 2014.

Additional communications also reflect the Defendant's been in contact with other individuals in relation to the transshipment of items with the ultimate destination being Russia.

THE COURT: Can I ask on paragraph 21 of the indictment, on page 9 of the indictment, there's a line that indicates, however, Larin was aware and it's redacted of history of purchasing items and then shipped to locations in

Kazakhstan.

MR. REIN: Yes.

THE COURT: Is that a co-conspirator or is that a co-defendant?

MR. REIN: It's a co-defendant. The name that's redacted is a co-defendant. That person is believed to reside in Russia and has yet to be apprehended.

THE COURT: Okay.

MR. REIN: And just as background in that paragraph, the reason the Defendant knew about that is because he had shipped items that had been purchased by the co-defendant to locations in Kazakhstan along the border with Russia. And so --

THE COURT: You know, also, the Government indicates that the co-defendant is at large --

MR. REIN: Correct.

THE COURT: -- and is believed to be in Russia as you just noted. And you know, from the Government's letter, there's argument that it's providing a life line for the Defendant. Why is that appropriate? Why is that a factor that the Court should consider here?

MR. REIN: Well, it's a factor to consider the -- because it just goes to a Defendant's ties to in this not extradition country.

Obviously, the Government believes that the Defendant

knows -- almost assuredly knows the identity of the co-defendant. You know, it's been redacted from these papers given the fact that he had extensive business dealings with him. That person is based in Russia and is part of the Government's investigation. The Government believes that these items were ultimately being procured and destined for the Russian war effort.

And so, to the extent that the Defendant worked to seek to flee to Russia, he certainly had a sympathetic ally there in the form of a co-defendant.

I will and the last factor -- last point I want to make is that given the national security implications of this case, one, the Defendant faces up to 20 years in prison on several of the charges, including the ECRA conspiracy and also the attempt to violate the AECA, the Arms Export Control Act.

THE COURT: And I'm sorry, just to be clear, so the maximum penalties for the crimes Defendant is charged with is upwards of 20 years?

MR. REIN: It's 20, the maximum statutory maximum is 20 years.

THE COURT: Okay.

MR. REIN: His Guidelines because this is a national security case and implicates national security controls, the reason why many of these items are even controlled in the first place is because of national security concerns.

His offense level in this case would start at a level 26, which is extremely high. He -- when you say -- he's facing several years in prison upon conviction if he were to receive a Guideline sentence in this case. So, for those reasons, the Government believes that detention is appropriate.

I will note that obviously, reasonable minds can differ when it comes to what is essentially a subjective determination, but under any analysis, the bail package that the Defense is proposing at this point is just woefully inaccurate -- I'm sorry, inadequate.

In this case, $100,000 unsecured bond is just simply insufficient. As stated in the bail report that was prepared in the Southern District of Florida, the Defendant has substantial assets.

Now I've learned recently from Defense counsel that because the Defendant's been arrested and his business operation has been shut down, his financial status had been impacted, but as reflected in the Pre-trial Services Report, the Defendant has a net worth upwards of 1.5 million dollars and was residing in a residence that's worth 1.4 million dollars and has tens of thousands of dollars in bank accounts and also in other assets, including his business and different cars.

I will note that the Government's aware of several other bank accounts, which are not included in this analysis

but that the Defendant did use in connection with his business as well.

The Defendant was -- stated at the time of his arrest he was making upwards of $6,000 a month. And so, $100,000 just simply is insufficient to -- and especially an unsecured bond would be considered insufficient to secure the Defendant's appearance especially given his ties to a non extradition country.

The Government also believes that the Defendant's wife is not an appropriate suretor in this case. She is an officer of the company that the Defendant used to engage in this scheme.

In records that the Government's obtained from -- which are publicly available from the Florida Department of Corporations, the Defendant's wife is listed as the vice president of his company.

She's also a signatory on the bank account for his company 4 Shooters, which as I said was used to engage in in this scheme.

THE COURT: And I'm sorry, which company is she a vice president of?

MR. REIN: 4 Shooters.

THE COURT: Four, the number 4 Shooters is --

MR. REIN: The number 4 and the word Shooters.

THE COURT: Okay.

MR. REIN: Which it also goes by the name 4 Range as well. And so, and the company because the Defendant was paid by the co-defendant for the items he shipped directed -- directly benefitted financially from this scheme.

It was also related earlier today at our appearance before Judge Morrison that the Defendant is the sole breadwinner.

And so, it really does not add much security at all to the proposed bail package to have his wife as a suretor if she would really not be able to contribute much and to paying any amount that was listed as a bond.

She would be jointly and severally liable, but yet, the Government would not be able to collect from her at all based upon what the Government's been led to believe.

In addition, the other conditions that have been suggested by the Defense don't do enough to accurately reflect the criminal conduct that he engaged in here.

At a minimum, the conditions of any bond should require that he be prohibited from dealing in any items which are subject to the ITAR, those being items that are listed on the U.S. munitions list, which cannot shipped outside of the United States. That was not part of the Defense proposal.

The Government also believes that any bond would have to include a condition that the Defendant not ship firearms, firearms accessories, or firearms parts. Even if they are not

subject to the ITAR, they should -- he should still be prohibited from shipping them internationally.

So, for all these reasons, Judge, the Government believes that detention in this case is still appropriate. And even if the Court were to find differently and believe that there were conditions which could adequately ensure his return to Court, that those -- that the proposed conditions are at this point insufficient and a much more robust bail package is required.

THE COURT: And just to go back the very beginning of your argument here, you indicated that the Government's primarily proceeding under flight. Is the Government proceeding under danger to the community particularly given the firearms-related charges and the access to firearms?

MR. REIN: That is not a prong of the argument we're making, Judge.

THE COURT: Okay, so let me hear from Defendant?

MS. HARRIS-CALVIN: Thank you, Your Honor. I (indiscernible) bail opposition. And most of it speaks to the fact that the Government has not proven to the Court by a preponderance of the evidence that he is -- Mr. Larin is a serious flight risk. Not an ordinary flight risk, but the statute says serious flight risk.

And the case law that I cited throughout my letter to the Court makes it clear that the Government needs to show that

he's a serious flight risk in the first instance.

And only after the Court decides if it does that the Defendant is a serious flight risk do -- then move on to what an appropriate bail package is.

And so, I will start with my arguments with respect to the first prong of the Court's analysis. And I submit to the Court that they have not shown that Mr. Larin is a serious flight risk.

As I note in my opposition to the application for detention, Mr. Larin is a -- has been a United States citizen for a decade and a half. His children -- he has three school aged children who have never lived outside of this country and who are at home with their mother, who's also a U.S. citizen, and also has his two parents, retired parents, who are green card holders that he sponsored to be here. And they're retired here.

And so, they don't live with the family. They live very close by in a home that is owned by Mr. Larin and his wife.

And so, in terms of any inclination that one might have to abandon their family, their entire family and leave them pretty much destitute because his wife does not work and bring an income and now there is no business, at the moment, it would take much more than a offense that carries no mandatory minimum for a person who's never been arrested and never been

in trouble, and whose business that the Government speaks to, it is a firearms business, but it is a business that is legal in the state of Florida, which has very strong Second Amendment laws. And he has been a competitive shooter for over a decade and a half. And that did start in Russia when he lived in Russia.

Russia and Kazakhstan have competitive shooting, international competitive shooting coalitions or what are they called?

THE DEFENDANT: International (indiscernible) association.

MS. HARRIS-CALVIN: Associations, right. And so, the fact that he is from Russia and he has -- is dealing in firearms accessories and parts, which are legal here, has a legal business here in the United States, does not mean he's a serious flight risk. And we have the contacts that he has.

And he does not have any communication, consistent communications with any family -- extended family in Russia. The Government claims that this co-defendant -- this unidentified co-defendant might be some kind of life line with no proof about that. That's purely speculative.

And based on the fact that they have presented to the Court with respect to Mr. Larin's so-called relationship with this person, it was purely by email. It was never in person. The unidentified co-defendant set up the -- his account with

Mr. Larin's legal business under the name of a co-conspirator who is not Russian as far as he can tell from the indictment.

And there's no indication that they had been in communication at all since midyear last year. And so, think -- to think that he has some kind of life line in Russia and that he's some kind of criminal mastermind or he'd be an international fugitive who abandons his family because he's facing a nonmandatory minimum sentence in a jurisdiction where, you know, variances -- downward variances happen quite often, particularly for people who are not a danger and who have no criminal record is a bit absurd.

And certainly, even if it is a factor to consider for a potential flight risk, it does not rise to the level of a serious flight risk.

THE COURT: What about his brother that resides in Russia?

MS. HARRIS-CALVIN: They have not been in contact since Mr. Larin has moved to the United States. So he doesn't have that life line.

There's no indication that his brother's going to help him be an international fugitive and support him financially or in abandoning his family who would not be coming with him.

And so, again, he has many more contacts with the United States. He's been here much longer. He has a

competitive shooting committee here. He has friends here. He goes to church here with his family.

So, there's no reason, no reason to believe that he is going to become an international fugitive when he is not facing, you know, 20, 30, life mandatory sentence. And the Government just has not proven that he's a serious flight risk.

THE COURT: Just let me understand, though, is there a dispute though about what the maximum penalties are for the crimes charged?

MS. HARRIS-CALVIN: No, there's a zero to 20 year statutory range. And to this point, it's unclear how or why even if the sentencing exposure as anyone who's charged with this case has a sentencing exposure to 20 years, there's no indication that there'd be some above Guideline sentence at this point that he should be afraid of, such that he will abandon his children and his wife in a mountain of debt, which we discussed with Judge Morrison this morning and really never see them again.

Also, the Government speculates -- I mentioned this in a footnote in my letter. And of course was not personal to Government counsel, but this is clearly a case where Mr. Larin is running a legal business. The Government does not say this is some criminal enterprise that does this at -- in regular course.

It appears from what we know so far that their

allegations are that this one particular client, who ordered parts, engaged in this alleged illegal conduct to simply violate Customs laws for shipping outside of the country to pay less for it and to cut through red tape.

And so, though the laws, when they were created, have larger national security bases for these laws, when you look the facts of this case, this was a case where, again, I don't have discovery yet. We're negotiating a protective order, but from what I can calculate from looking at the numbers in the indictment, looking at how much a RAPTAR costs, this is less than 60-, $70,000 worth of items when his -- the Government seized half a million dollars worth of inventory that is not relevant to this case and at this point has not been shown to be illegal.

So, again, this isn't some huge criminal scheme. He's no huge criminal mastermind. He's not running a criminal enterprise even as the Government alleges.

So to state that because they've taken a comment out of context with respect to his feelings about the Ukraine-Russia War, that then it means that he is supplying the Russian military and the war somehow is quite absurd. And I think it smacks as xenophobia.

So I think the Court should ignore that, because there is no indication that he has anything to do with the military in Russia, with the war in Russia.

And when you speak to his website and the counts, we looked -- we at the Federal Defenders looked further and note his -- I think his 4shooters.com was registered in Russia 15 years ago. It is actually hosted by an American company. And his tech support team that he contracts with, one is a Ukrainian in Ukraine and the other person is in Finland.

So, again, this was not some connection to, again, a criminal enterprise that he is running here and connected to some criminal enterprise helping to fund the billion dollar war in Russia versus Ukraine.

This is a legitimate business where the allegations show that some small component with one co-defendant engaged in mislabeling the otherwise legal firearm parts to avoid Custom charges and red tape.

THE COURT: Can I ask, just going back there for a moment to the proposed bond package, why is this a sufficient bond package, particularly given the allegations related to his wife, you know, being the vice president of this company and, you know, not being a proper suretor from the Government's perspective?

MS. HARRIS-CALVIN: Your Honor, if I might push back a little bit, I don't think there are even acts that part of the analysis because the Court has not found that he is a serious flight risk.

If by the way should the Court finds he's a serious

flight risk, which we disagree obviously, I'm happy to discuss what about his flight the Court should be tailoring the bond package. But at this point, the Court hasn't even found that he is a serious flight risk.

THE COURT: Well, again, assuming that the Court finds that he's a serious flight risk --

MS. HARRIS-CALVIN: Correct.

THE COURT: -- why is your bond package sufficient?

MS. HARRIS-CALVIN: Excuse me. It's sufficient because as I noted before, he -- well, I didn't note this. I noted it in my memorandum, both the Southern District of Florida Pre-trial Services agency and the Eastern District of New York Pre-trial Services agency suggest -- recommended to this court an unsecured personal bond.

And so, the $100,000, given the fact that the Government has seized all of his inventory, so his business is in the red, his wife has had to sell one of their cars to pay their home expenses the months he's been incarcerated. And they don't have any income moving forward, I think that is sufficient to show that a larger amount of money would not be appropriate.

Now the Government did point to the fact that their home in Florida is worth a million dollars, but Florida has a Homestead Act. And so, it cannot be attached.

And that's why I proposed in the bail package that

the Court does adopt the Southern District of Florida's proposed condition that his residence not be sold, pledged, mortgaged, hypothecated, or otherwise encumbered until the bond is discharged such that, one, if you have a concern about flight, he can't just sell his home that's not attached by the Court and run away.

But also, just to make clear that, you know, he -- his family, their finances at that point make it such that, you know, he and his wife, who have moral suasion given the kids, their lives here, their community here in the States, it's appropriate to have $100,000 bond with him and her signing as suggested.

Pre-trial Services didn't suggest her specifically, but suggested an unsecured personal bond signed by another person.

Now if the Court would like a second person, I would ask the Court to allow -- release him today, obviously, but allow another week to confirm a second person. I do know that there are family members and community members, who are friends with him, who might be willing, but they don't live here in New York. So there's a little bit more logistics.

But if the Court would like a second person, another financially responsible person to sign, I think we can pretty easily get that person to sign.

THE COURT: Okay, thank you. Let me hear from the

Government in response?

MR. REIN: Yeah, Judge, I just want to note one thing in particular. Recommendations that come from Pre-trial, both in our district and subject to Florida, they cannot consider certain of the 3142(g) factors, which include the weight of the evidence in the case and the potential penalty in the case.

So when Pre-trial formulates a recommendation, it does not account for those factors. Those factors are very important. And that's why they're included in 3142. So I think that that's something that's important to note.

In terms of the claim that the Government has not shown the Defendant's a serious flight risk, we've stated that he's a citizen of a non extradition country. He has -- he had a passport from that country.

And so, we -- he's doing business with people who are based in that country. So those factors suggest that he would be a serious flight risk and certainly has ties to that country.

In connection with counsel's argument that the Government hasn't shown there's any connection between the Defendant's conduct and the Russian War effort, I would say the very nature of these types of crimes is that it's very difficult to ship things directly to Russia. And that is why things are shipped to these transshipment points like Kazakhstan.

And somebody who's into that business, a firearms dealer would -- it's reasonable to assume they would know obviously that there's a major war that is going on in that region and that when items are being shipped to locations that are only, you know, miles away from the border of one of the major belligerents in that conflict, that that is cause for concern.

The Government laid out in the indictment the fact that the Defendant knew that there would be particular scrutiny given to these shipments by Customs. For those reasons, he chose to obfuscate what was being shipped.

The Defendant was willing to deceive the U.S. Customs officials. It is not beyond the pale to suggest that the Defendant would be going to deceive authorities yet again if it's in his own interest.

And so, for those reasons, the Government does believe he is a flight risk notwithstanding the fact that he has family that lives here.

Certainly if all this stuff had been admitted here, then the bail analysis would be much different than it actually is. So, for those reasons, we believe detention's appropriate. In any event, the bail package proposed is not sufficient.

MS. HARRIS-CALVIN: Your Honor, may I respond briefly?

THE COURT: Sure.

MS. HARRIS-CALVIN: Okay.

THE COURT: And counsel, you can be seated, too. I apologize for saying this earlier, but you can be seated.

MS. HARRIS-CALVIN: And so, it's just a reflex. So I just want -- I pointed this out in the memo, but you know, the Government does state a lot about this being a national security concern, but this -- these particular charges do not trigger a presumption. And therefore, liberty is actually the presumption in this matter.

Secondly, all federal charges are serious, right? Almost all federal charges carry pretty high maximum potential penalty.

And so, I cited case law that talks about how the fact that someone is charged with a federal crime that carries a high potential penalty that does not have a mandatory minimum alone is not enough to push the Court over the line to give that person enough incentive to flee.

Also, the Bail Reform Act doesn't say because you're not -- because you're a naturalized U.S. citizen and someone not born here, that weighs in favor of you obviously being a flight risk. And that is why we have argument around contacts with this community, contacts abroad, et cetera.

And so, I understand why the Government's making that argument. They are welcome to make that argument under the case law and the Reform Act, but I submit to the Court that the

Court should not weigh those arguments heavily, given the fact that the Bail Reform Act does not make this a presumption case.

And serious risk of flight is not -- does not have a -- has a dispositive factor that the person is a naturalized U.S. citizen.

THE COURT: Okay, thank you.

Any response from the Government?

MR. REIN: No, Your Honor.

THE COURT: All right, one moment. All right, so just as a procedural matter, I do note as Defendant pointed out to have a detention hearing, there needs to be this threshold inquiry.

I do think the Government has shown at minimum that there's a serious risk or that Defendant here will flee, which would then allow for the detention hearing to take place, which we just had. So I just want to be clear on that on the record.

So then turning to the arguments raised on detention and the bail package, I do find that a permanent order of detention is appropriate here.

And I'll lay out my reasons. I do think that the Defendant is an actual and serious risk of flight and that no conditions -- no combination of conditions can secure his appearance at trial.

And that's based on my review of the indictment, the Pre-trial Services Report, the submissions at docket entry 6

and 16, and the letters from the Government, the Defendant, as well as the arguments they raised today in the Pre-trial Services Report.

I do think the Government has met its burden with respect to risk of flight, which is, just to be clear, the Government must establish by a preponderance of the evidence that the Defendant presents a serious risk of flight from 3142(f)(2). And I'll also cite there to the United States v. Friedman, 837 F.2d 48 in the 2nd Circuit, 1988.

Going through the factors, starting in 34 -- again, under 18 USC 3142(g), the nature and circumstances of the offense charged including whether the offense is a crime of violence, here, as alleged by the United States, I do think that the charges here are extremely serious. I do think there's a threat to national security.

There is -- one of the offenses charged was the Defendant's point -- excuse me, that the Government points out is a charge that has a 20-year maximum, but per the indictment, the Defendant provided misleading descriptions, values to U.S. Customs officials for the contents of parcels being exported, and that these descriptions did not reflect the true nature of the tactical and military equipment being shipped instructed by U.S. authorities to enforce export laws.

As laid out in the indictment and as set forth by the Government here today, this scheme, which was allegedly

orchestrated by a co-defendant Russian national, who has yet to be apprehended, resulted in weapons being shipped to Kazakhstan, which the Government argues is a known transshipment point and is obviously in close proximity to the Russian border.

The Defendant, as alleged here and as proffered by the Government, which is appropriate at this stage, is that the Defendant deliberately lied, mislabeled items to further the scheme all for his own benefit and profit.

As the indictment lays out in December 2022, the Russia-based co-defendant began to procure tactical and military style equipment from the Defendant's business.

And then, the Defendant -- co-defendant requested that Mr. Larin mislabel and undervalue the items he was shipping to Kazakhstan.

As the Government points out, after the co-defendant ordered several sets of tactical headphones valued at almost $6,000, Mr. Larin agreed to mislabel the items and state in shipping forms that the total value is less than what was set forth.

The Government points to Mr. Larin acting in a manner to avoid attracting the attention of the authorities. They also proffer that in approximately May 2023, Mr. Larin shipped multiple enhanced triggers and charging handles to Kazakhstan at the co-defendant's request. And these firearms, as the

Government points out in the indictment, allegedly make it easier to fire a rifle.

Now, importantly in my view, the Government proffers that in December of 2023, Mr. Larin agreed to a rapid targeting and ranging module, or RAPTAR as the parties have called it today, target acquisition device. This is a precision targeting device as has been described by the Government.

And it's subject to the International Traffic and Arms Regulations, the ITAR that the parties have referenced. It cannot be shipped outside of the U.S. without a license from the Department of State.

And Mr. Larin, as alleged in the indictment, did not have such a license. I don't think that's even in dispute, but even if it is in dispute, again, the Government can proffer that here for these purposes.

And after acquiring the RAPTAR, the Government proffers that Mr. Larin agreed to ship the RAPTAR device as a co-conspirator of the United States, who then attempted to ship it to Kazakhstan in violation of the ITAR. And the device was intercepted.

And as clarified today, the Government proffers that he was aware of his co-defendant's history of purchasing items and aware of sending the RAPTAR outside the country. He knew that in the Government's view, that he would be -- that it would be shipped outside of the country.

That's very significant to me, again, because of the nature of that particular device, the parameters in which it was exchanged.

And, again, the fact that there is strong evidence here and the Defendant is potentially having a sentence of up to 20 years in prison.

So the weight against the Defendant is significant. You know, again, while the Defendant is presumed innocent of the charges, the Government -- the Court can still take the serious allegations against him into consideration when justifying his attention. And that's from United States v. Lewis, 5 F.Supp.3d 515 from the Southern District in 2014.

The Government here again points to email communications between the Defendant and his Russia-based co-defendant in which the Defendant agrees to mislabel and devalue items before shipping them.

The Government also possesses Customs records, which document the international shipment.

So the weight of the evidence against the Defendant is strong. The nature and circumstances of the crimes charge is strong.

In terms of the history and characteristics of the Defendant, the most significant in my view relate to his ties to Russia, which is a nonextradition country.

I appreciate that he does not have a close

relationship with his brother, but he does have a biological brother as set forth in the Pre-trial Report, which does live in Russia. He's a dual citizen of Russia. And as the Government argues, he has access -- potentially has access to a co-defendant who is in Russia.

And again, this is a factor that weighs in favor of detention, particularly when there is that risk of flight. And I'll point to United States v. Bruno, 89 F.Supp.3d 425 from the Eastern District in 2015 that when the sentence of imprisonment upon conviction is likely to be long, the Defendant has strong motive to flee.

Now I also think that there are no conditions of release that will adequately assure the Defendant's appearance in Court. I referenced the United States v. Atomei case, a little -- a few moments ago. And again, I'll just give you that citation from 2024 W.L. 1934195, where the court stated as others -- as other courts in the Circuit have found, location monitoring is inadequate because ankle monitors can be easily removed, ensure only a reduced headstart should the Defendant decide to flee. That's a direct quote from Judge Brodie's opinion in that case, Chief Judge Brodie.

You know, so I think there are serious concerns here about any conditions that could allow him to be in the country even if there was an ankle monitor proposed, which is not part of the bond package.

And then, finally, I do find that the bond -- the proposed bond package is insufficient. I think that the Government has shown, has proffered at this point, that there are serious questions about the one suretor who's listed, who's the Defendant's wife, whose allegedly the vice president of the 4 Range, 4 Shooters company that the Defendant had overseen.

There's a question about moral suasion there as well, given that she does have this relationship as vice president of the company.

On top of the fact that there's apparently significantly more money than they had first alleged in terms of the net worth being approximately 1.5 million dollars.

So, for all those reasons, I find and for the reasons set forth here, I find the bail package to be insufficient. I deny the application.

And I'm going to find that there's no condition or combination of conditions that would reasonably assure the Defendant's return to Court, okay? So I'll enter or I'll continue the order of detention that's been entered.

THE CLERK: Okay.

THE COURT: All right, anything further at this point?

MR. REIN: Not from the Government, Judge.

MS. HARRIS-CALVIN: No, Your Honor.

THE COURT: All right, thanks very much.

THE CLERK: Thanks very much. Okay, thank you.

(Proceedings concluded at 12:45 p.m.)

**CERTIFICATE**

I, Chris Hwang, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Chris Hwang

November 9, 2025

Chris Hwang — Date

Court Reporter